IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WILLIE RAY SMITH,                    §
      Plaintiff,                 §
                                     §
V.                                   §            No. 3:19-cv-1841-BN
                                     §
SUMMIT MIDSTREAM                     §
PARTNERS LP,                         §
      Defendant.                 §

## MEMORANDUM OPINION AND ORDER

In this Title VII race discrimination and retaliation case, the Court denied Defendant Summit Mainstream Partners, LLC's Motion for Summary Judgment [Dkt. No. 36], *see* Dkt. No. 46, before the case was transferred to the undersigned United States magistrate judge on the consent of the parties under 28 U.S.C. § 636(c)(3), *see* Dkt. No. 59. After reviewing the summary judgment briefing in preparing for trial, the Court now *sua sponte* reconsiders order denying the motion for summary judgment and, for the reasons explained below, will grant it.

### Background

The following facts come from the summary judgment record and are either undisputed or set forth in the light most favorable to Smith as the non-movant plaintiff.

I.    <u>Smith's employment with Summit</u>

Summit provides natural gas, crude oil and produced water gathering services to its customers pursuant to customer-specific agreements. *See* Dkt. No. 38

at 3 ¶3. Through a series of pipelines and plants, Summit treats and moves gas from its basins to various delivery points. *See id*. at ¶4.

Two of Summit's plants are relevant to Smith's claims: the Amine or Treater plant located in Venus, Texas, and the Compression plant located approximately 13 miles away. *See* Dkt. No. 14 at 1-2, ¶¶ 2, 3. The purpose of the Compression plant is to compress the gas to achieve a higher PSI and to dehydrate the gas. *See* Dkt. No. 38 at 4 ¶5. The purpose of the Treater plant is to chemically remove $CO_2$ from the gas stream from the Compression plant to meet Summit's contractual obligations to its clients. *See id*. Each plant has its own operators whose skillsets are specific to the jobs they are performing. *See id*. at ¶7. A compression operator is responsible for the mechanical operation of the compressors. *See id*. A treater plant operator is responsible for keeping the treater plant operating to achieve blended gas within the customer's specifications. *See id*. at ¶¶7, 23.

Smith began his employment with Summit in September 2011 as a compressor operator. *See id*. at 1-2 ¶2. Shane Cooley, his supervisor when he was a compressor operator, noted performance issues including Smith's "lack of knowledge on compressor limits" and the "need[] to sharpen his mechanical skills." *See id*. at 8-11. Smith did not consider himself a mechanic. *See id*. at 33, 49.

In September 2014, Cooley and Joe Vasquez, Summit's VP, hired Smith as an amine operator (also referred to as a treater plant operator). *See id*. at 12, 131. Smith was an amine operator until his employment was terminated on August 1, 2015. *See id*. at 21, 46.

There were two amine operators at Summit's Treater plant when Smith was terminated: Smith and Victor Spikes. *See id*. at 23. They worked 12-hour shifts, from 6:00 a.m. to 6:00 p.m., *see id*. at 26, 38, and then were on call to respond to emergencies after hours, *see id*. at 15 ¶13. They had alternate eight-days on, six-days off schedules with overlap on Wednesdays. *See id*. at 28, 143.

Under Summit's contractual agreement with its customer, the level of $CO_2$ in the gas treated at the Treater plant is measured over a period of a month, with each month ending on the morning of the first day of the month. *See id*. at 40. If Summit fails to deliver gas within its customer's specifications, Summit must pay a tariff to the customer. *See id*. at 119. To maintain the agreed $CO_2$ level, Smith and Spikes were required to complete various tasks, including performing daily chemical tests on the gas to determine whether the plant needed amine or water and adjusting as necessary, *see id*. at 106, and monitoring and changing amine filters, *see id*. at 36.

Amine is a chemical mixed with water to remove $CO_2$ from the gas. *See id*. at 142. The amine picks up grease and suspended solids from the gas and is then run through the filter system. *See id*. at 144. The amine filters help to remove impurities in the gas. *See id*. at 37-38. If the filters become clogged, the amine cannot treat the gas, which will cause the $CO_2$ level to rise. *See id*. at 116, 120-21. If the $CO_2$ level rises too high, the plant will shut down. *See id*. at 109-10. Plant shutdowns impede Summit's ability to meet the specifications required by its customer. *See id*. at 116.

It is important that amine operators monitor the filtration system and put

filters back in service as quickly as possible. *See id*. at 122-23. To change a filter, an operator must "bypass" the filter. *See id*. at 125. While the filter is on bypass, the gas is not being treated with amine and contaminants enter the system, so the filter bypass time should be as short as possible. *See id*. at 122-23, 129.

Generally, an operator is expected to complete chemical checks upon arrival to work, which should take about 15 minutes. *See id*. at 120. But, when a filter is bypassed, the filter should be put back in service before an operator completes the chemical checks. *See id*. at 115, 120-21.

As amine operators, Smith and Spikes reported to the manager of the Treater plant, a position held by Eldon Garrison in 2014 until he was promoted to director of the Treater plant, and then by Michael Christopher from on or around 2015. *See id*. at 13 ¶3, 39, 43. When Garrison was Smith and Spike's supervisor, he instructed them to bypass filters at night and change the filters first thing in the morning unless there was a situation at the plant that required the filters to be changed at night. *See id*. at 112, 123.

On January 4, 2015, Garrison instructed Smith that he needed to keep the filters in service because the amine was foaming, which is an indication that the filters were being bypassed. *See id*. at 111, 126, 136.

On July 29, 2015, Smith received a disciplinary notice in his personnel file for failing to perform his job duties and follow the chain of command. *See id*. at 112-13; Dkt. No. 41 at 41, 117-20. Christopher signed and provided to Smith the write-up regarding Smith's job performance, which he had shared with Garrison in advance.

*See id.* In the write-up, Summit instructed Smith to follow the chain of command on his phone calls and to "quit calling everyone to change his filter or work on a pump." *Id.* at 41. Will Mosely, a compressor operator, reported to Eldon Garrison that Smith called him several times to change filters for him. *See* Dkt. No. 38 at 126, 128. Smith also was expected to do some basic mechanic work at the Treater plant, mostly repairing and building pumps. *See id.* at 113-14. Smith was calling mechanics to do the basic mechanic work that Summit expected him to complete himself. *See id.* at 33, 113. Smith had also called Charlie Brooks and Erica Frisbie several times regarding a process that Smith had been shown may times. *See* Dkt. No. 41 at 41; *see also id.* at 17-18.

Summit contracted with third parties Pilot Thomas Logistics and Huntsman to periodically sample the gas at the Treater plant for analysis and recommendations. *See* Dkt. No. 38 at 13 ¶4. The samples did not reflect the performance of the operator on duty when the samples were drawn. *See* Dkt. No. 41 at 84-85. The July 31, 2015 report identified impurities in the amine that should have been removed through the filters had they been in service. *See* Dkt. No. 38 at 14 ¶5.

Spikes called Christopher multiple times a week to tell him that he was changing filters in case Christopher needed to reach him by phone, *see id.* at 16 ¶7; Dkt. No. 41 at 109, but Smith only contacted Christopher two or three times in several months, *see* Dkt. No. 38 at 16 ¶7. The infrequency of the phone calls from Smith related to filter changes caused Christopher to suspect that Smith was not

changing filters as often as expected by Summit, and he began investigating. *See id.* And, during Smith's shifts, several employees who had gone into the plant to check on a compressor told Christopher that Smith had placed the filters on bypass. *See* Dkt. No. 41 at 109.

On July 31, 2015, Christopher, Garrison, and Spikes each communicated to Smith the importance of keeping the plant running because they were at the end of the month and needed to meet the customer's specifications. *See* Dkt. No. 38 at 94-96.

Prior to leaving work on July 31, 2015, Smith bypassed the filters and retired for the day. *See id.* at 14 ¶8.

The next day, Smith arrived at work for his 6 a.m. shift. At no time from the start of his shift until around 9 a.m. did Smith put the filters back in service. *See id.* at ¶¶9-10. Eldon Garrison, Dakota Lee, and Michael Christopher arrived at the Treater plant around 9 a.m. and found the filters still bypassed. *See id.* at 2, ¶11; 12 at ¶9; 127-28. When they asked why the filters were bypassed, Smith responded that he "meant to close them" and admitted that he "should not have bypassed the filters [the previous night]." *See id.* at 5, ¶12; 14, ¶10; 117-18. Smith admitted that he bypassed the filters on the night of July 31, 2015, because he did not want them to fail overnight. *See* Dkt. No. 41 at 12-13, 21-22.

At that time, Dakota Lee, Vice President of Operations-Eastern Business Unit, terminated Smith's employment for continued willful neglect of his duties. *See* Dkt. No. 38 at 5 ¶13, 12; Dkt. No. 41 at 13.

-6-

After Smith left the premises, Garrison placed Smith's bypassed filters back into service and noted that they were still functional. *See* Dkt. No. 38 at 123. Shortly after Spikes arrived at noon, the filters stopped up and Spikes changed them. *See id.* Garrison determined that there was no business purpose for Smith to have placed the filters on bypass and opined that the only reason for Smith to have bypassed the filters when he did was to avoid them failing and having to be replaced during Smith's shift. *See id.*

Christopher executed a letter on August 1, 2015 regarding Smith's termination. *See* Dkt. No. 41 at 52. The letter states that the reasons for Smith's termination were his continued inability to perform his job functions and willful negligence of his duties. *See id.* The letter further states that Smith had "been counseled many times regarding poor job performance" and, despite training and mentorship, was not effectively executing his duties. *Id.* The letter specified that Smith had been calling other operators to perform his duties for him and that he had been purposely bypassing the amine filters to avoid having to change them himself. *See id.*

## II.   Compressor Lead Operator Position Opening

In early 2015, Summit had an opening for a lead operator at the Compression plant. *See id* at 44. Smith claims that he expressed to Garrison that he was interested in the position, *see id.* at 46, but he did not apply for the position, *see id.* at 44.

Cooley selected Johnny Gonzales, who Smith asserts is non-Black, for the

position. *See id*. at 45. Gonzales began in this role on March 1, 2015. *See id*. at 6, ¶18. According to Smith, Gonzales was selected for the position because Gonzales's wife and Colley's wife were best friends and Gonzales threatened to quit if he did not get the job. *See id*. at 45.

Smith contends that he was more qualified for the position because he has eight years of experience as a gas compressor operator. *See id*. at 47. Smith claims that he told Garrison and Lee that if he were "White with [his] experience and knowledge that [he had, he'd] be up the ladder." *Id*. at 50

Summit hired Gonzales for the lead operator position based on his significant relevant experience in the industry, his performance, his work ethic, mechanical aptitude, willingness to make simple repairs, and leadership skills. Gonzales also already worked in the compression plant at the time that Summit offered him the lead position. *See id*. at 6, ¶18; 13, ¶14. Smith admits that he has no knowledge of Gonzales's qualifications for the lead operator position. *See id*. at 52.

III.    Procedural History

On December 15, 2015, Smith filed a Charge of Discrimination with the EEOC, alleging that Summit discriminated against him on the basis of race and age. *See id*. at 51, 72-73. He filed an amended charge of discrimination on March 29, 2017, adding the allegation that Summit was providing negative references in retaliation for filing his original charge of discrimination. *See id*. at 53-54, 80-81.

The EEOC issued a right-to-sue letter on May 8, 2019. *See* Dkt. No. 14 at 9.

Smith filed this lawsuit on August 1, 2019. *See* Dk. No. 1. In his Second

Amended Complaint, Smith brings claims for racial discrimination and retaliation. Smith, a Black male, alleges Summit violated 42 U.S.C. §2000e-2(a) because his race played a role in Summit's decisions to terminate his employment and to hire a less qualified non-Black person for the lead operator position at the Compression plant *See* Dkt. No. 14 at 5-6. He alleges that Summit violated 42 U.S.C. §2000e-3(a) by retaliating against him for complaining about Summit's allegedly unlawful employment practice of consistently passing him over for various promotions in favor of less qualified White males. *See id.* at 6.

Summit moved for summary judgment. *See* Dkt No. 36. It argued that the race discrimination claim must be dismissed because Smith has no direct or circumstantial evidence of race discrimination; Summit had legitimate, nondiscriminatory and nonretaliatory reasons for its employment decisions; and Smith cannot establish pretext. Summit argued that the retaliation claim must be dismissed because Smith failed to exhaust administrative remedies; Smith cannot establish a prima facie claim of retaliation; Summit had legitimate, non-retaliatory reasons for terminating Smith's employment; and Smith cannot establish pretext.

Smith filed a response, *see* Dkt. No. 39, and Summit filed a reply, *see* Dkt. No. 44.

The Court denied the summary judgment motion, stating that it found that genuine issues of material fact exist such that a reasonable jury might return a verdict in favor of either party. *See* Dkt. No. 46.

The parties then waived their rights to proceed before a district judge of the

United States District Court and consented to have a United States magistrate judge conduct any and all further proceedings, including any trial, and order entry of a final judgment. *See* Dkt. Nos. 58, 58-1. The case was then transferred to the undersigned United States magistrate judge "to conduct all further proceedings and the entry of a judgment in accordance with 28 U.S.C. § 636(c)(3)." Dkt. No. 59.

The Court now *sua sponte* reconsiders order denying Summit's motion for summary judgment and, for the reasons explained below, will vacate the order denying it and enter an order granting it.

## Legal Standards

I. <u>Summary Judgment</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual "issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997).

If the moving party seeks summary judgment as to his opponent's claims or defenses, "[t]he moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of

the nonmoving party's case." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which it will bear the burden of proof at trial. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (cleaned up).

"Once the moving party meets this burden, the nonmoving party must set forth" – and submit evidence of – "specific facts showing a genuine issue for trial and not rest upon the allegations or denials contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *accord Pioneer Expl.*, 767 F.3d at 511 ("[T]he nonmovant cannot rely on the allegations in the pleadings alone" but rather "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for

trial." (cleaned up)).

The Court is required to consider all evidence and view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party – but only if the summary judgment evidence shows that an actual controversy exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Pioneer Expl.*, 767 F.3d at 511; *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Lynch Props.*, 140 F.3d at 625. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor. While the court must disregard evidence favorable to the moving party that the jury is not required to believe, it gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 942-43 (5th Cir. 2015) (cleaned up). And "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden, *Little*, 37 F.3d at 1075; *accord Pioneer Expl.*, 767 F.3d at 511 ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." (cleaned up)). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some

metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (cleaned up).

Rather, the non-moving party must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Pioneer Expl.*, 767 F.3d at 511 (cleaned up). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott*, 550 U.S. at 380 (cleaned up). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *DIRECTV, Inc. v. Minor*, 420 F.3d 546, 549 (5th Cir. 2005) (cleaned up). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (cleaned up).

The Court will not assume "in the absence of any proof ... that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (cleaned up).

If, on the other hand, "the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). The "beyond peradventure" standard imposes a "heavy"

burden. *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:04-cv-1866-D, 2007 WL 2403656, at \*10 (N.D. Tex. Aug. 23, 2007). The moving party must demonstrate that there are no genuine and material fact disputes and that the party is entitled to summary judgment as a matter of law. *See, e.g.*, *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). On such a motion, the Court will, again, "draw all reasonable inferences in favor of the non-moving party." *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

II.   <u>Discrimination and Retaliation</u>

"Title VII prohibits discrimination 'because of' a protected characteristic, including race." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216, 219 (5th Cir. 2016) (citing 42 U.S.C. § 2000e-2(a)(1)). That statute similarly prohibits retaliation because an employee engages in protected activity. *See* 42 U.S.C. § 2000e-3(a); *Starnes v. Wallace*, 849 F.3d 627, 635 (5th Cir. 2017) ("[T]he ultimate question in a retaliation case [is] 'whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in' protected conduct." (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996); emphasis in *Long* )).

In the absence of direct evidence of discrimination or retaliation, claims under Title VII are analyzed under the framework set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Outley*, 840 F.3d at 216, 219. Under this framework, a plaintiff must establish a prima facie case of discrimination or retaliation before the case may proceed. *See McCoy*, 492 F.3d at 556.

To establish a prima facie claim of discrimination, a plaintiff must show that he

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Id.* (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)); *Outley*, 840 F.3d at 216.

"[T]he third prong ... require[s] an 'ultimate employment decision' or its factual equivalent." *Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393, 396-97 (5th Cir. 2016) (per curiam) (citing *McCoy*, 492 F.3d at 560; *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) ). This "judicially-coined term refer[s] to an employment decision that affects the terms and conditions of employment ... such as hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson*, 764 F.3d at 503 (cleaned up); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) (holding that the anti-discrimination provision of Title VII "explicitly limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace").

And a plaintiff establishes a prima facie case of retaliation under Title VII by showing that (1) he engaged in an activity protected under the statute; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *See McCoy*, 492 F.3d at 557; *Outley*, 840 F.3d at 219.

If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. The employer's burden is only one of production, not persuasion, and involves no credibility assessment. If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. *McCoy*, 492 F.3d at 557 (cleaned up); *see, e.g.*, *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 827-28 (5th Cir. 2015) (affirming the district court's recognition that, even where a plaintiff establishes a prima facie case, an employer "would nevertheless be entitled to summary judgment if it articulated a legitimate, nondiscriminatory ... reason for its employment action' and [the plaintiff] could not show a triable issue of fact as to whether the employer's proffered reason is not true but instead is a pretext for a discriminatory purpose" (quoting *McCoy*, 492 F.3d at 557; cleaned up)).

## Analysis

I.   The Court has discretion to reconsider the Motion for Summary Judgment.

Federal Rule of Civil Procedure 54(b) provides that a court may revise interlocutory orders at any time before the entry of judgment. *See* FED. R. CIV. P. 54(b) ("Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties

does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017).

The denial of a motion for summary judgment is an interlocutory order, which the trial court may reconsider and reverse for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law. *See Jackson v. Roach*, 364 F. App'x 138, 139 (5th Cir. 2010). And it is within a newly assigned judge's power to consider a motion *sua sponte* and vacate the first judge's order. *See id.; see generally Deloach v. Delchamps, Inc.*, 897 F.2d 815, 826 (5th Cir. 1990) ("A court is free to vacate an interlocutory order on its own motion."). And, after assuming jurisdiction in a civil consent case under Section 636(c), a magistrate judge is not bound by a district judge's earlier opinions in the case. *See Cooper v. Brookshire*, 70 F.3d 377, 37 & n.6 (5th Cir. 1995).

II.   Summit is entitled to summary judgment on the racial discrimination claim.

A.   Smith fails to establish a prima facie case on his termination claim.

Title VII provides that an employer commits an unlawful employment practice if it discharges an employee or otherwise discriminates against an individual as to compensation or the terms, conditions, or privileges of employment because of the individual's race. *See* 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove discriminatory intent by direct or circumstantial evidence or both. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002).

"Direct evidence is evidence that, if believed, proves the fact of discriminatory

animus without inference or presumption." *Id.* at 897. "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat'l Bank*, 34 F.3d 325, 329 (5th Cir. 1994).

Smith testified at his deposition that no one at Summit told him that an employment decision was based on his race and also that nobody at Summit mentioned his race at all. *See* Dkt. No. 38 at 43.

For purposes of summary judgment, Summit does not dispute that Smith has established the first two prima-facie-case requirements: that he is a member of a protected class who was qualified for the Treater plant operator position. But Smith's race discrimination claim fails because he fails to raise a genuine dispute of material fact as to the third and fourth requirements – that he was treated less favorably than similarly-situated Summit employees who were outside of his protected class or that he was replaced by someone who was outside of his protected class.

Smith fails to identify proper comparators – individuals of a different race than him "under nearly identical circumstances" who were treated more favorably. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009); *see also Wright v. Chevron Phillips Chem. Co., L.P.*, 734 F. App'x 931, 934 (5th Cir. 2018) (per curiam) ("Both the comparator and the conduct must be 'nearly identical' (except for the protected characteristic) to the person and situation in question yet the two yielded dissimilar results." (quoting *Outley*, 840 F.3d at 217-18 (quoting, in turn, *Lee*, 574

F.3d at 260))).

> "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260 (quoting, first, *Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004), and then *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001); emphasis added in *Lee*; footnotes omitted); *accord Moore v. Univ. Miss. Med. Ctr.*, 719 F. App'x 381, 386-87 (5th Cir. 2018); *see also Noble v. Lear Siegler Svcs., Inc.*, 554 F. App'x 275, 276 (5th Cir. 2014) (per curiam) (rejecting an African-American plaintiff's claim that he established this prima facie element by asserting that "five Caucasian men in his unit kept their jobs" because he failed to "show that these comparators were under 'nearly identical circumstances'" by presenting "evidence regarding the comparators' job descriptions, qualifications, experience, work and disciplinary history, or other information that would indicate that they were similarly situated" (quoting *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001))); *Reyna v. Donley*, 479 F. App'x 609, 611-12 (5th Cir. 2012) (per curiam) ("An employee must proffer a comparator who was treated more favorably 'under nearly identical circumstances,' which is satisfied when 'the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.'" (quoting *Lee*, 574 F.3d at 260)).

*Seastrunk v. Entegris, Inc.*, 3:16-cv-2795-S-BN, 2018 WL 4328020, at *5 (N.D. Tex. Aug. 20, 2018).

Spikes is the only alleged similarly situated employee mentioned in the Second Amended Complaint, *see* Dkt. No. 14 at 5, or in Smith's response to the Motion for Summary Judgment, *see* Dkt. No. 40 at 11. In the summary judgment response, Smith only argues that Spikes was treated more favorably concerning

overtime, *see id.*, and in his Affidavit in support of the Response, Smith states that Spikes was treated more favorably concerning overtime and hauling water, *see* Dkt. No. 41 at 9.

In an interrogatory answer, Smith identifies four White Summit employees who he claims were similarly situated because they also allegedly bypassed amine filters for significant periods of time: Victor Spikes, Eldon Garrison, Jerry Walker, and Jerrod Kuhlam. *See* Dkt. No. 38 at 62-63. Of the four, only Victor Spikes had the same job responsibilities and the same supervisor as Smith.

Eldon Garrison was Smith's supervisor and a salaried employee. Smith was an hourly employee. *See* Dkt. No. 41 at 62. Garrison occasionally took a shift as an amine operator. When the shift was on the weekend and someone had placed a filter on bypass the night before, Garrison would call the on-call amine operator to change the filter the next morning so he could get overtime. *See id.*

Smith does not identify any summary judgment comparator evidence about Jerry Walker and Jerrod Kuhla. *See Romanowski v. Wells Fargo Bank, N.A.*, No. 3:18-cv-1567-D, 2019 WL 3429064, at *2 (N.D. Tex. July 30, 2019) ("Rule 56 obligates the nonmovant to designate the specific facts in the record that create genuine issues precluding summary judgment. It does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition. To satisfy [his] burden, the nonmovant is required to identify specific evidence in the record, and to articulate the precise manner in which that evidence support[s] [his] claim." (cleaned up)).

As to Spikes, Smith fails to identify summary judgment evidence showing that he and Smith had nearly identical disciplinary histories. At his deposition, Smith testified that he did not know if Spikes had been disciplined, but he speculated that Spikes had not been disciplined because he was still employed by Summit. *See* Dkt. No. 38 at 27-30. But Summit submits evidence showing that Spikes was notifying Christopher multiple times each week that he was changing filters, while Smith only notified Christopher two or three times in several months, *see* Dkt. No. 38 at 16 ¶7, and, although others at the plant reported that Smith was bypassing filters, there were no similar reports regarding Spikes, *see* Dkt. No. 41 at 109.

Smith also fails to show that he was replaced by someone outside of his protected class. Summit hired Jerry Walker as a compressor operator on May 14, 2012. Walker remained a compressor operator until July 2018 when he became a field operator. *See* Dkt. No. 38 at 4 ¶6. Walker, a current employee, assumed some of Smith's job duties for a temporary period after Smith was terminated on August 1, 2015, and while Walker retained the job of compressor operator. *See id*. at 4 ¶8. An employee has not been replaced when his former duties are distributed among other co-workers. *See Griffin v. Kennard Indep. Sch. Dist.*, 567 F. App'x 293-294-95 (5th Cir. 2014) (quoting *Rexses v. Goodyear Tire & Rubber Co.,* 401 F. App'x 866, 868 (5th Cir.2010)); *see also Seastrunk*, 2018 WL 4328020, at *4 ("[W]hen an employee's position has been eliminated and the job duties reassigned to existing employees, that employee has not been replaced." (cleaned up)).

B.     <u>Smith fails to establish a prima facie case for the failure to promote.</u>

-22-

"To succeed on a failure to promote claim, a plaintiff must ultimately show that '(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position.'" *Jenkins v. Louisiana Workforce Comm'n*, 713 F. App'x 242, 244–45 (5th Cir. 2017) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007)).

Smith fails to establish a genuine dispute of material fact on the second requirement. Although Smith told Garrison that he was interested in the lead compressor operator position, he did not submit a formal application. *See* Dkt. No. 38 at 44, 46. Nor did Smith have the mechanical experience required for the job. *See id.* at 6 ¶14. Smith admitted that he was not a mechanic, *see id.* at 33-35, 48-49, and his supervisors criticized him for his lack of mechanical knowledge and either his inability or unwillingness to perform mechanical functions on the job, *see id.* at 5 ¶14, 8-11.

Because Smith cannot establish a prima facie claim of race discrimination, Summit is entitled to judgment as a matter of law on this claim. And, because Smith failed to support a prima facie case of discrimination in response to Summit's Motion for Summary Judgment, the Court need not address Summit's alternative argument that Smith has not created a genuine dispute of material fact as to whether any legitimate, nondiscriminatory reasons that Summit offers are a pretext for unlawful discrimination.

IV.    <u>Summit is entitled to summary judgment on the retaliation claim.</u>

Summit moves for summary judgment on its affirmative defense that Smith failed to exhaust his administrative remedies for his Title VII retaliation claim. *See* Dkt. No. 18 at 5 ¶24. In his Second Amended Complaint, Smith contends his termination was based in part on Summit's retaliation against him for complaining to Summit's managers about its alleged unlawful employment practice of consistently passing over Smith for various promotions in favor of less-qualified White males. *See* Dkt. No. 14 at 6 ¶7. Smith amended his charge of discrimination to add a retaliation charge. *See* Dkt. No. 38 at 80-81. In the amended charge, Smith alleged Summit was retaliating against him by giving bad references to potential employers because he filed the original claim of discrimination. *See id.*

As an initial matter, the Court notes that Smith does not address the retaliation claim in his response to Summit's Motion for Summary Judgment. But, even overlooking this, Smith's retaliation claim fails as a matter of law because Summit has met its burden to show that this claim exceeds the reasonable scope of Smith's amended charge of discrimination.

While a statute's "administrative exhaustion requirement is not a jurisdictional bar to suit," *Davis v. Fort Bend Cnty.*, 893 F.3d 300, 306 (5th Cir. 2018) (discussing Title VII), that "does not mean that this requirement should be ignored," *id.* at 307.

> "The purpose of this exhaustion doctrine is to facilitate the administrative agency's investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws."

> Administrative exhaustion is important because it provides an opportunity for voluntary compliance before a civil action is instituted. For this reason, Title VII requires administrative exhaustion.

*Id.* (quoting *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012)); *see also, e.g.*, *Taylor v. Lear Corp.*, No. 3:16-cv-3341-D, 2017 WL 6209031, at *2 (N.D. Tex. Dec. 8, 2017) ("It is well settled that courts may not entertain claims brought under Title VII as to which an aggrieved party has not first exhausted [her] administrative remedies by filing a charge of discrimination with the EEOC." (cleaned up)).

> In determining whether a plaintiff has exhausted a particular claim, [the Fifth Circuit has] noted that "the scope of an EEOC complaint should be construed liberally." *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006). "On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims." *Id.* at 788-89. To balance these considerations, "[courts in this circuit interpret] what is properly embraced in review of a Title-VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which 'can reasonably be expected to grow out of the charge of discrimination.'" *Id.* at 789 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)). "[Courts should] engage in fact-intensive analysis of the statement given by the plaintiff in the administrative charge, and look slightly beyond its four corners, to its substance rather than its label." *Id.*

*Patton v. Jacobs Eng'g Group, Inc.*, 874 F.3d 437, 443 (5th Cir. 2017).

Smith failed to exhaust his administrative remedies as to the retaliation claim because the retaliation claim that he asserts in his complaint is not included in the amended charge of discrimination.

Summit is entitled to judgment as a matter of law on the retaliation claim.

## Conclusion

-25-

The Court VACATES the order denying Defendant Summit Midstream Partners, LLC's Motion for Summary Judgment [Dkt No. 46] and GRANTS Defendant Summit Mainstream Partners, LLC's Motion for Summary Judgment [Dkt. No. 36] and dismisses with prejudice Plaintiff Willie Ray Smith's Title VII race discrimination and retaliation claims.

The Court will separately enter a final judgment.

DATED: October 13, 2021

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE